Filed 1/21/21 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SHAHROKH MIRESKANDARI,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>LAUREN GALLAGHER, as Executor,<br>etc.,<br><br>    Defendant and Respondent. | D076130<br><br><br><br>(Super. Ct. No. 37-2015-<br>00029990-CU-FR-CTL)<br><br><br>ORDER MODIFYING<br>OPINION AND DENYING<br>REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

The opinion filed December 30, 2020, is hereby modified as follows:

1.    On page 8, at the end of the first full paragraph (after "to the SDT."), add the following new footnote 5 and renumber the remaining footnotes:

> In a petition for rehearing, Mireskandari characterizes the basis of his CMIA claim to be "the totally unauthorized disclosure of Mr. Mireskandari's confidential and sensitive protected medical information not only to the opposing party [LSE/SRA], *but to assorted third parties*, not all of whose identities are known to Mr. Mireskandari." (Italics added.)  We disagree.  Based on the record, the alleged CMIA violation is limited to Scoma's disclosure of

Mireskandari's medical records *to the LSE/SRA* as part of the SDT proceedings. In the complaint, Mireskandari does not allege that Scoma disclosed the records "to assorted third parties" as he argues on appeal.

2. On page 28, replace the last three sentences of the first full paragraph (beginning with "Mireskandari's claim . . ." and ending *prior to the footnote* with "Scoma necessarily *communicated* them.") with the following:

> Mireskandari's claim is not that he was damaged by Scoma "fraudulently concealing": he believed he was working only for the LSE/SRA; he would not travel to Los Angeles to conduct a physical examination of Mireskandari because of a prior drunk driving arrest; or he provided his professional opinion without having reviewed Mireskandari's medical records. Similarly, Mireskandari's claim is not that he was damaged by Scoma obtaining Mireskandari's medical records "under false pretenses." Rather, in his appellate briefing Mireskandari expressly tells us that he was damaged when Scoma "*forward*[ed] *them* to an unauthorized third party." (Italics added.) Although the complaint does not allege that Scoma forwarded the medical records to anyone other than the LSE/SRA (see fn. 5, *ante*), even if we assume that Scoma forwarded them to an unauthorized third party, in *forwarding* the records, Scoma necessarily *communicated* them.

The paragraph then ends with newly renumbered footnote 19.

3. On page 29, at the very top, delete the first sentence ("Further, Mireskandari makes no attempt . . .") and insert the following sentence:

> Further, Mireskandari makes no attempt to allege in the complaint or to explain in his appellate briefing how he might have suffered $500 million in damages as a result of the following arguably *noncommunicative* acts by Scoma: "fraudulently concealing" either his belief he was working for the LSE/SRA or the reasons he did not want to conduct a physical examination of Mireskandari; or obtaining Mireskandari's medical records "under false pretenses."

2

Mireskandari's petition for rehearing is denied.

There is no change in judgment.

McCONNELL, P. J.

Copies to:  All parties

Filed 12/30/20 (unmodified opinion)

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| SHAHROKH MIRESKANDARI, Plaintiff and Appellant, v. LAUREN GALLAGHER, as Executor, etc., Defendant and Respondent. | D076130 (Super. Ct. No. 37-2015-00029990-CU-FR-CTL) |


APPEAL from a judgment of the Superior Court of San Diego County, John S. Meyer, Judge. Affirmed.

James & Associates, Becky S. James and Lisa M. Burnett for Plaintiff and Appellant.

Reback, McAndrews & Blessey, Robert C. Reback and Rebecca G. Goldstein for Defendant and Respondent.

In a second amended complaint (complaint), Shahrokh Mireskandari alleged four causes of action against Joseph Scoma, M.D.,[1] based on the reports and opinions Scoma provided at the request of a disciplinary tribunal in London, England, as part of the tribunal's formal proceedings involving Mireskandari, his legal practice, and his license to practice law in the United Kingdom. The trial court sustained without leave to amend Scoma's demurrer to the complaint and entered judgment in favor of Scoma and against Mireskandari. As we explain, on the record presented by Mireskandari, California's litigation privilege codified at Civil Code section 47, subdivision (b) (section 47(b)), bars each of Mireskandari's causes of action. Thus, we will affirm the judgment.

## I. FACTUAL BACKGROUND[2]

Mireskandari received an undergraduate degree from National University in California, graduated from the American University of Hawaii

---

[1]    Scoma passed away in April 2017, and in December 2017 the probate court appointed Lauren Gallagher as the executor of the Estate of Joseph A. Scoma. In November 2020, this court granted a motion to substitute Gallagher, as the personal representative of Scoma's estate, as the respondent in this action. (Code Civ. Proc., § 377.41.) For ease of reading, we do not differentiate between Scoma and Gallagher, although the arguments on appeal are made by Gallagher, and the disposition of the appeal affects only Gallagher as the party respondent.

[2]    Because this is an appeal following a demurrer, we are limited to and "must accept the facts pleaded as true and give the complaint a reasonable interpretation." (*Mathews v. Becerra* (2019) 8 Cal.5th 756, 762 (*Mathews*).) Under this standard, when describing or referring to the "facts," we mean the facts *as alleged* in the complaint.
     Earlier this year, the complaint in this action was before us on Mireskandari's appeal from a judgment in favor of different defendants following the sustaining of their demurrer without leave to amend. (*Mireskandari v. Gilbert* (July 23, 2020, D074976) [nonpub. opn.] (*Gilbert*).)

2

law school in 1997, and attended London Guildhall University Law School in London in 1998. He qualified as a solicitor in 2000, and by 2006 he was the managing partner of a London firm with mostly "black, minority, or ethnic origin" (BME) solicitors and staff.

In 2007, Mireskandari publicly disclosed to a member of Parliament problems BME solicitors experienced "at the hands of the Legal Society of England and Wales ('LSE') and the Solicitors Regulatory Authority ('SRA')" (together, the LSE/SRA).[3] As a result, an internal review was commenced

<hr>

On our own motion we take judicial notice of *Gilbert*. (Evid. Code, §§ 459, subd. (a), 452, subd. (a).) The appellate panel in this appeal is the same as in *Gilbert*, and we must accept the same facts here as we accepted in *Gilbert* (*Mathews*, *supra*, 8 Cal.5th at p. 762). Thus, in this opinion, we adopt without citation to *Gilbert* much of the factual presentation from *Gilbert*.

[3]     The LSE is the "governing body of legal professionals in the United Kingdom." (Landen, *The Prospects of the Accountant-Lawyer Multidisciplinary Partnership in English-Speaking Countries* (1999) 13 Emory Int'l L.Rev. 763, 799.) Among other responsibilities, the SRA is "the regulatory arm of the [LSE]" (Parks, *Justice and Equality* (Jan.-May 2012) NBA Nat. Bar Assn. Mag.) and is one of a number of regulatory authorities that licenses individual lawyers in the United Kingdom (Hadfield & Rhode, *How to Regulate Legal Services to Promote Access, Innovation, and the Quality of Lawyering* (2016) 67 Hastings L.J. 1191, 1210).

"The SRA has no legal existence separate from the LSE. Though the LSE and SRA are formally independent from the government, both are accountable to the statutorily-created Legal Services Board . . . , which is itself accountable to Parliament through the Lord Chancellor." (*Mireskandari v. Mayne* (9th Cir. 2015) 599 Fed. Appx. 677, 677-678 [affirmance of dismissal of Mireskandari's complaint against the LSE and the SRA on the basis that, because they "engage 'in a public activity on behalf of the foreign government,'" the claims against them are subject to dismissal under the Foreign Sovereign Immunities Act of 1976 (28 U.S.C. § 1602 et seq.)].)

Our references to "the LSE/SRA" are based on Mireskandari's submissions to the trial court and his briefing on appeal in which he does not differentiate between the two entities.

relating to the allegedly discriminatory and racist practices of the LSE/SRA toward BME solicitors. In retaliation, the LSE/SRA began a campaign to discredit Mireskandari. As part of its effort to obtain Mireskandari's "confidential information"—and, as a pretext for intervening in Mireskandari's law practice—the LSE/SRA retained a Los Angeles law firm. The LSE/SRA instructed the Los Angeles law firm "to illegally access" a specific website "to obtain [Mireskandari's] educational records without notice to or knowledge of [Mireskandari]." In late September 2008, one of the firm's paralegals "unlawfully and illegally . . . gain[ed] access to [Mireskandari's] confidential educational records" and communicated the information she received to the LSE/SRA.

Within two weeks being advised of these records, the LSE/SRA demanded from Mireskandari information regarding his "educational and work background."

Approximately two months later, in mid-December 2008, the LSE/SRA intervened in Mireskandari's law practice.

More than two years later, in early April 2011, the Solicitor's Disciplinary Tribunal (SDT) "initiated the proceedings against [Mireskandari] regarding the intervention of [Mireskandari's] legal practice and his license to practice law in the United Kingdom" (SDT proceedings). After approximately three weeks of testimony, the SDT temporarily adjourned the SDT proceedings.

At that time, Mireskandari travelled to California. He became seriously ill and requested that the SDT proceedings be further adjourned. In support of his request, Mireskandari submitted evidence from California physicians of his illness, his inability to travel to England, and his inability to participate in the SDT proceedings.

4

In response, at the request of the LSE/SRA, the SDT appointed Scoma "as an independent expert (not the expert of the LSE/SRA)," and directed counsel to instruct Scoma "that he was to act as an independent expert." Consistently, in April 2012, which was almost a year after the adjournment, Scoma was directed in writing "that he was to be an independent expert to determine whether [Mireskandari] was medically fit to travel to London for the conclusion of the proceedings before the SDT."

Scoma did not perform a physical examination of Mireskandari. Based on his receipt from Mireskandari's doctor and his review of what he described as " 'a comprehensive medical package . . . contain[ing] the medical records concerning Mr. Mireskandari's colorectal history,' " on May 23, 2012, Scoma reported to the LSE/SRA (only) that Mireskandari " 'should be able to travel to London at any time.' " The next day, which was four days prior to the date set for the continued proceedings before the SDT, in response to a direct inquiry from the LSE/SRA, Scoma provided the additional opinions that " 'Mireskandari is able to instruct legal representatives, prepare for, attend, and participate in the hearing due to commence on May 28, 2012. I see no reason why he is unable to travel by plane from the USA to the UK.' " In providing these opinions, Scoma "disregarded the reports from [Mireskandari's] doctors which demonstrated that [Mireskandari] was on substantial medications that impaired his judgment at that time and which would have made him unable to properly instruct his legal representatives or attend and participate in hearings."

The continued proceedings before the SDT did not commence on May 28, 2012. Over the course of the next two weeks, the LSE/SRA and Scoma continued to exchange letters and medical reports—all without Mireskandari's knowledge, authority, or permission. On June 12, 2012,

5

Scoma sent an email to LSE/SRA, stating that he " 'will review the seven statements[,] letters[,] and reports,' " but that he " 'd[id] not plan on changing [his] report of May 23, 2012.' " Later that day, Scoma submitted an addendum to his May 2012 report, advising that his " 'opinion and report remain the same.' "

The LSE/SRA presented Scoma's report to the SDT, which rejected Mireskandari's request for a delay and proceeded with the hearing in Mireskandari's absence. Based on the SDT proceedings, the SDT struck Mireskandari from the roll of solicitors, thereby preventing him from practicing law in the United Kingdom. This resulted in the permanent closing of the law firm of which he was a partner. Mireskandari suffered damages in excess of $500 million.

## II.  PROCEDURAL BACKGROUND

In September 2015, Mireskandari filed this lawsuit against Scoma and others.[4] In a second amended complaint (previously identified as the complaint), Mireskandari alleges causes of action against Scoma for breach of contract, breach of fiduciary duty, fraud and deceit (fraudulent concealment), and the unauthorized disclosure of Mireskandari's medical records. Underlying the first three causes of action is Mireskandari's allegation that Scoma's actions—including but not limited to communicating with the LSE/SRA, taking instructions from the LSE/SRA, advocating for the LSE/SRA, and producing Mireskandari's medical files without his

---

[4] Mireskandari named a Los Angeles law firm and one of its paralegals as codefendants in the underlying action and in the complaint. Mireskandari's claims against the other defendants are independent from his claims against Scoma. The other defendants, not parties to this appeal, were the respondents in *Gilbert*, *supra*, D074976.

authorization—demonstrate that, "in violation of the terms and conditions of his appointment as an independent expert in the case," Scoma did not act independently.

In support of his cause of action for breach of contract, Mireskandari alleges that he was a third-party beneficiary of the agreement between the SDT and Scoma, pursuant to which Scoma agreed "to provide an independent examination of [Mireskandari's] medical condition." Scoma breached this agreement to the detriment of Mireskandari because, instead of conducting an independent examination of Mireskandari, "Scoma acted as the LSE/SRA's expert and advocated their position as to [Mireskandari's] condition and whether he could travel to London for the proceedings before the SDT."

In his second cause of action, Mireskandari alleges that, as an independent medical expert, Scoma owed Mireskandari a fiduciary duty. Scoma breached this duty when he "acted on behalf of the LSE/SRA to the detriment of [Mireskandari]," by "improperly communicat[ing] with the LSE/SRA" and "fail[ing] to communicate at all with [Mireskandari] when providing his reports to the LSE/SRA."

Mireskandari's third cause of action seeks relief based on Scoma's fraud and deceit. Mireskandari alleges that, despite having been retained as an independent expert, Scoma fraudulently concealed the following from Mireskandari: (1) Scoma believed that he was working for the LSE/SRA (not the SDT); (2) Scoma had communications with, and took directions from, the LSE/SRA with regard to what information to include in his report; (3) the true reason that Scoma, a San Diego resident, could not travel to Los Angeles to examine Mireskandari; (4) Scoma provided Mireskandari's medical records to the LSE/SRA without Mireskandari's authorization; and (5) Scoma

7

provided his opinions without reviewing all of Mireskandari's medical records.

In his last cause of action against Scoma, Mireskandari asserts statutory violations of the California Confidentiality of Medical Information Act (CMIA) (Civ. Code, § 56.10 et seq.), based on what Mireskandari contends was the unauthorized production of his medical records to the LSE/SRA, which then produced them to the SDT.

Scoma demurred to the complaint and to each of the four causes of action alleged against him.[5] Scoma first argued that each cause of action failed to allege facts sufficient to state a cause of action (Code Civ. Proc., § 430.10, subd. (e)), because each was barred by the litigation privilege (Civ. Code, § 47(b)). In addition, Scoma argued that each cause of action failed to allege facts sufficient to state a cause of action (on grounds other than the litigation privilege) or, alternatively, was uncertain, ambiguous, and unintelligible (Code Civ. Proc., § 430.10, subds. (e), (f)).

Mireskandari filed written opposition to the demurrer. In part, and as relevant to the disposition of this appeal, he relied significantly on a request for judicial notice and the "Expert Report of Thomas Roe, Q.C. on behalf of Plaintiff, dated 8/3/16" (Roe report) presented as an exhibit to the request.[6]

---

[5]    Scoma also filed, in the alternative, a motion to strike portions of the complaint. In sustaining Scoma's demurrer without leave to amend, the trial court denied the motion to strike, ruling it was moot.

[6]    The Roe report is entitled "Expert Report on English Law on Behalf of [Mireskandari]" (capitalization and bolding omitted), and contains numbered paragraphs which set forth:  (1) an introduction ("I have been asked by [Mireskandari's] attorneys to give my opinion on certain questions concerning the relevant law of the United Kingdom as to the immunity or otherwise [*sic*] of expert witnesses."); (2) a description of Roe's qualifications and experience; (3) a list of the documents Roe reviewed in preparing his report; (4) factual

Substantively, Mireskandari argued that the law of the United Kingdom, not of California, applied; and Mireskandari attempted to present the law of the United Kingdom by way of the content of the Roe report and case law from courts of the United Kingdom.

In reply to the opposition, Scoma argued principally that, for purposes of applying a litigation privilege, the law of California, not of the United Kingdom, was controlling and, alternatively, that each of the causes of action failed to allege facts sufficient to state a cause of action.

The court entertained oral argument, the focus of which was whether the law of California or the United Kingdom applied to Mireskandari's claims. At the conclusion of the hearing, the court confirmed its tentative ruling and sustained the demurrer without leave to amend. In a written minute order, the court took judicial notice of five exhibits submitted by Mireskandari (i.e., the Roe report and four cases) and then explained its ruling sustaining the demurrer to the complaint without leave to amend. First, the court determined that, with regard to the litigation privilege, it would apply the law of California, not of the United Kingdom. The court then applied California's litigation privilege (Civ. Code, § 47(b)[7]) and concluded that it was a complete defense to the four causes of action alleged by

---

assumptions for Roe's opinions; (5) Roe's responses to five specific questions; and (6) a typewritten closing that includes Roe's name, title, address, email address, telephone number, and the date "3 August 2016" (which, Mireskandari explains on appeal, is because he previously filed the Roe report in support of his opposition to Scoma's demurrer to an earlier amended complaint in this action).

[7]     Civil Code section 47(b) provides in part: "A privileged publication or broadcast is one made: [¶] . . . [¶] (b) In any . . . judicial proceeding . . . [or] official proceeding authorized by law[.]" (Civ. Code, § 47.)

9

Mireskandari. In the alternative, the court ruled that, in each of the four claims, Mireskandari failed to state facts sufficient to constitute a cause of action. (Code Civ. Proc., § 430.10, subd. (e).)

The court entered a judgment of dismissal with prejudice in favor of Scoma and against Mireskandari. Mireskandari timely appealed.

## III.  DISCUSSION

On appeal, Mireskandari contends that the trial court erred in: applying the California, rather than the United Kingdom, litigation privilege as a bar to each of the four claims in the complaint; and, alternatively, in concluding that each of the four claims fails to state facts sufficient to constitute a cause of action. Mireskandari also argues, that, in the event we agree that any of the four claims fails to state facts sufficient to constitute a cause of action, the trial court erred in denying leave to amend.

We affirm. As we explain, Mireskandari did not meet his burden of establishing that, on the record presented, the trial court erred in applying California's litigation privilege (Civ. Code, § 47(b)) as a bar to his claims against Scoma. Thus, we affirm the judgment without reaching the issues of whether any of the four causes of action fails to state facts sufficient to constitute a cause of action and, accordingly, whether Mireskandari should have been granted leave to amend such a cause of action.

A.  *Standards of Review*

The trial court's judgment is "presumed to be correct." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609 (*Jameson*).) Thus, the appellant has the burden of affirmatively establishing reversible error. (*Ibid.*)

We review de novo an order sustaining a demurrer without leave to amend. (*Mathews, supra,* 8 Cal.5th at p. 762.) "[W]e accept the truth of material facts properly pleaded in the operative complaint, but not

10

contentions, deductions, or conclusions of fact or law.  We may also consider matters subject to judicial notice." (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 924, fn. omitted.)

We review the trial court's ruling, not the reasons stated for the ruling. (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 980-981 (*Rappleyea*) [even where the trial court's legal reasoning is erroneous, the ruling will be affirmed if it can be supported by any legal theory]; *Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329-330 [same].)  The rationale for this standard is that there can be no prejudice from an error in logic or reasoning if the decision itself is correct. (*Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 610.)

"Determination of the law . . . of a foreign nation . . . is a question of law to be determined in the manner provided in" Evidence Code section 450 et seq., which deal with judicial notice.  (Evid. Code, § 310, subd. (b).) "Because a demurrer raises only questions of law (Code Civ. Proc., § 589), trial courts ordinarily do not consider evidence in connection with a demurrer.  But a court may consider matters subject to judicial notice when ruling on a demurrer, and foreign law is subject to [permissive] judicial notice (Evid. Code, § 452, subd. (f)).  In taking judicial notice, a court may rely on 'the advice of persons learned in the subject matter . . . whether or not furnished by a party.'  (Evid. Code, § 454, subd. (a)(1)[.])" (*Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 478, fn. 4 (*Nedlloyd*) (conc. & dis. opn. of Kennard, J.).)

B.     *Request for Judicial Notice*

In support of his appellate briefing, Mireskandari filed a motion, asking that this court take judicial notice of the following nine documents:

11

- British case law identified as (1) "*Jones v. Kaney* [2011] UKSC 13," (2) "*Les Laboratoires Servier v. Apotex Inc.* [2014],"[8] (3) "*Patel v Mirza* [2016] UKSC 42, [2016] 3 WLR 399," (4) "*Tinsley v. Milligan* [1994] 1 AC 340," and (5) "*Three Rivers District Council v Governor & Company of the Bank of England* (No. 5) (2003) EWCA Civ 474";

- a British statute identified as (6) "Data Protection Act (1998, updated 2018)";

- a British treatise identified as (7) "Crown Prosecution Service (U.K.), Criminal Practice Direction V – Evidence (2015), CPD V 19A.8, 19A.9 . . . and relevant provisions 19A.8 and 19A.9"; and

- United States federal court documents identified as: (8) "Excerpts of Deposition of Joseph A. Scoma, M.D. taken January 21, 2013 in *Mireskandari v. Solicitors Regulation Authority (In re Mireskandari)*, No. 12-cv-2865-IEG-DHB (S.D. Cal. case filed Dec. 3, 2012)," and (9) "Order Granting in Part Appellant's Motion to Compel, ECF No. 27, *Mireskandari v. SRA*, No. 12-cv-2865-JAH-DHB (S.D. Cal. order filed March 1, 2013)."

(Evid. Code, § 459; Cal. Rules of Court, rule 8.252.)

For the reasons that follow, we deny Mireskandari's motion in its entirety.[9]

---

[8] Neither Mireskandari's request, Mireskandari's proposed order, nor the actual document in the appellant's appendix contains a citation for this case.

[9] We thus disregard factual statements in the appellate briefing for which the record reference is to a document for which judicial notice has been denied. (Cal. Rules of Court, rule 8.204(a)(1)(C) [an appellate brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"]; see *Fierro v. Landry's Restaurant Inc.* (2019) 32 Cal.App.5th 276, 281, fn. 5 ["appellate

12

Since the British cases and statute (documents (1)-(6), *ante*) are foreign law, arguably they are subject to permissive judicial notice under Evidence Code section 452, subdivision (f). (*Nedlloyd, supra*, 3 Cal.4th at p. 478, fn. 4.) However, because they are of no assistance to us without "the advice of persons learned in the subject matter" (Evid. Code, § 454, subd. (a)(1))—and, as we explain, the Roe report is not properly before us—they are irrelevant to the disposition of the issue under consideration.[10]

In addition, judicial notice of documents (2) and (4) ("*Les Laboratoires Servier v. Apotex Inc.* [2014]" and "*Tinsley v. Milligan* [1994] 1 AC 340," respectively) is inappropriate because Mireskandari did not mention either of them in his appellate briefing. (*Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1064-1065 ["Asking that authority be judicially noticed instead of citing and discussing it in a brief gives the parties no orderly opportunity to argue the relevance of that authority or to distinguish it"], overruled on other grounds in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276.)

Documents (7)-(9) contain hearsay, and " '[t]he hearsay rule applies to statements contained in judicially noticed documents,' " thereby

---

courts may ' "disregard any factual contention not supported by a proper citation to the record" ' "].)

[10] Although, "as a 'reviewing court' (Evid. Code, § 459, subd. (a)), we *must* take judicial notice of some matters (*id.*, § 451) and *may* take judicial notice of others (*id.*, § 452), . . . a precondition to the taking of judicial notice in either its mandatory or permissive form" is that "any matter to be judicially noticed must be relevant to a material issue." (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2; accord, *Golden Door Properties, LLC v. Superior Court of San Diego County* (2020) 53 Cal.App.5th 733, 758, fn. 16 (*Golden Door*) [the requests for judicial notice were "denied as not relevant to the disposition of th[e] issue" on appeal].)

" 'preclud[ing] consideration of those statements for their truth unless an independent hearsay exception exists.' " (*Barri v. Workers' Comp. Appeals Bd.* (2018) 28 Cal.App.5th 428, 437 (*Barri*).) Here, Mireskandari is not asking us to judicially notice *the existence* of the three documents. Rather, without suggesting any exception to the hearsay rule, Mireskandari asks us to rely on *the truth of facts* contained within those documents.

In addition, the British treatise (document (7)) is also irrelevant. Mireskandari relies on the treatise to support his argument that Scoma's deposition testimony from another action (document (8))—which is hearsay and not subject to judicial notice—establishes that Scoma violated British law. Since the deposition testimony is not properly before us, a treatise which allegedly establishes that the testimony establishes a violation of law is irrelevant to our disposition of the issue under consideration. (*Golden Door, supra,* 53 Cal.App.5th at p. 758, fn. 16.)

Our potential consideration of the Roe report—on which Mireskandari significantly relies in his appellate briefing (see pt. III.C.1., *post*)—requires a different analysis, since Mireskandari did not ask us to take judicial notice of it. Scoma did not oppose Mireskandari's request for judicial notice in the trial court, instead suggesting only that it "overstates U[nited ]K[ingdom] law and should be disregarded," and Scoma does not mention judicial notice in his appellate brief.

Although Evidence Code section 459, subdivision (a) generally requires that a reviewing court must take judicial notice of matters the trial court judicially noticed,[11] there are two exceptions: (1) if the matter was not

---

[11] We will assume without deciding that this part of Evidence Code section 459, subdivision (a) applies without the formality required by California Rules of Court, rule 8.252(a)(1), which provides in full: "To obtain

14

"properly noticed by the trial court," the appellate court is not required to take judicial notice; and, regardless, (2) the appellate court "may take judicial notice of a matter in a tenor different from that noticed by the trial court." (*Ibid.*) Here, because the Roe report contains 14 typewritten pages *with neither an oath nor a signature*, both of these exceptions apply: (1) by accepting the truth of the statements in the Roe report, the trial court did not properly take judicial notice (see *StorMedia Inc. v. Superior Court* (1999) 20 Cal.4th 449, 456, fn. 9 [the taking of judicial notice of a document is merely notice of the fact that the document exists; "the truthfulness and proper interpretation of the document are disputable"]; *Barri, supra*, 28 Cal.App.5th at p. 437 ["It is improper to rely on judicially noticed documents to prove disputed facts because judicial notice, by definition, applies solely to undisputed facts"]); and (2) given the lack of an oath and a signature, we would give the report a significantly different tenor than the trial court did, by disregarding it altogether for lack of reliability (see *Highlanders, Inc. v. Olsan* (1978) 77 Cal.App.3d 690, 697 ["The appellate court may adopt a construction of judicially noticed material contrary to that which the trial court found persuasive"]).

C.      *On the Record Presented, California's Litigation Privilege is a Complete Defense to Each of the Causes of Action in the Complaint*

Mireskandari argues that the trial court erred both in applying California, rather than United Kingdom, law and in ruling that California's litigation privilege is a defense to his claims against Scoma. As we explain, Mireskandari did not meet his burden of establishing reversible error.

---

judicial notice by a reviewing court under Evidence Code section 459, a party must serve and file a separate motion with a proposed order."

1.    *The Trial Court Did Not Err in Applying California Law*

The trial court sustained Scoma's demurrer on the ground raised in his pleadings—namely, that California's litigation privilege was a defense to each of Mireskandari's four California causes of action. On appeal, Mireskandari contends that, because at all times Scoma "acted at the behest of a British entity in connection with various British administrative actions relating to a British solicitor," the litigation privilege of the United Kingdom, not of California, applies. Mireskandari emphasizes that Scoma's "conduct occur[red] in connection with a purely British proceeding." (Initial capitalization omitted.) Under British law, Mireskandari's argument continues, the litigation privilege does not provide immunity to an independent expert like Scoma in defense of the claims from a party like Mireskandari.

" ' "[G]enerally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state. In such event [the party litigant] must demonstrate that the latter rule of decision will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it." ' " (*Washington Mutual Bank, FA v. Superior Court* (2001) 24 Cal.4th 906, 919 (*Washington Mutual*).) By his opposition to Scoma's demurrer, Mireskandari timely invoked the law of the United Kingdom, and in support of his position, he relied on the "governmental interest analysis" for dealing with this choice of law issue. As we explain, however, Mireskandari did not meet his burden of demonstrating that the application of the British litigation privilege in this California litigation of California state law claims would further the interests of the United Kingdom. Accordingly, Mireskandari did not meet his burden of demonstrating that the foreign law should be applied here.

16

When faced with a conflicts of law question in California, the proper application of the governmental interest analysis requires the court to " 'search to find the proper law to apply based upon the interests of the litigants and the involved states' "—or, as in the present case, the involved state (California) and foreign country (United Kingdom). (*Offshore Rental Co. v. Continental Oil Co.* (1978) 22 Cal.3d 157, 161 (*Offshore*)[12].) This approach generally involves three steps:

> " 'First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law "to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state" [citation] and then ultimately applies "the law of the state whose interest would be more impaired if its law were not applied." ' " (*McCann v. Foster Wheeler LLC* (2010) 48 Cal.4th 68, 87-88 (*McCann*), quoting *Kearney v. Salomon Smith Barney, Inc.* (2006) 39 Cal.4th 95, 107-108.)

This three-step analysis applies "whether the dispute arises out of contract or tort." (*Washington Mutual, supra*, 24 Cal.4th at p. 920.) Under this

---

[12]    In *Offshore*, a California corporation sued a Louisiana corporation for injuries negligently inflicted upon the California corporation's "key employee" in Louisiana. (*Offshore, supra*, 22 Cal.3d at pp. 160-161.) Applying the governmental interest analysis, the Supreme Court concluded that Louisiana law applied and affirmed the dismissal of the complaint on the basis that, under Louisiana law, no such cause of action could be stated. (*Id.*, at pp. 169-170.)

17

standard, "a separate conflict of laws inquiry must be made with respect to each issue in the case." (*Ibid*.)

Although Mireskandari sets forth and relies on the well-established and appropriate governmental interest analysis,[13] as we explain, he did not present the law of the United Kingdom in a form or format that allows us to determine it. By failing to establish the applicable law of the United Kingdom, therefore, Mireskandari necessarily failed to establish the first step of the analysis—namely, whether the applicable law in California and the United Kingdom (regarding the litigation privilege as a defense to a claim against an independent expert) " 'is the same or different.' " (*McCann, supra,* 48 Cal.4th at p. 87.)

On appeal, in his attempt to establish what he contends is the British law related to the litigation privilege, Mireskandari asked this court to take judicial notice of five British cases, and in his appellate briefing he relies on three of them *and the Roe report* (which is contained in the record on appeal because the trial court took judicial notice of it) to explain the British legal system and the application of the British law related to the litigation privilege. However, as we introduced in our denial of Mireskandari's request for judicial notice of British legal authorities on appeal (see pt. III.B., *ante*), the 14 typewritten pages of the Roe report *without an oath or signature* contain disputed facts and lack any indicia of reliability. For these reasons, we decline to rely on the report, which necessarily results in an insufficient showing by Mireskandari, who has the burden to establish (*Washington*

---

[13] This analysis has been the standard in California for more than a half century. (See *Reich v. Purcell* (1967) 67 Cal.2d 551, 553.) Scoma fails to mention this test, despite citing cases in which our Supreme Court has applied it; and we reject his suggestion to apply any different analysis.

18

*Mutual*, *supra*, 24 Cal.4th at p. 919) that British, not California, law applies. First, without the report, Mireskandari has not presented any judicially noticeable matter that describes or explains how, if at all, the United Kingdom applies a litigation privilege. Second, without this British legal authority, Mireskandari has not made a sufficient presentation under the governmental interest analysis for us to determine whether the foreign law is the same as or different than the California law on the issue.[14]

Even if we were to assume that the law of the United Kingdom applied, *based on the record before us*, Evidence Code section 311, subdivision (a) requires that we nonetheless apply California law: "If the law of . . . a foreign nation . . . is applicable *and such law cannot be determined*, the court may, as the ends of justice require, . . . [¶] . . . [a]pply the law of this state if the court can do so consistently with the Constitution of the United States and the Constitution of this state[.]"

Finally, in any event, even if we considered the Roe report, the result would be no different. That is because the report provides in part:

> "30. What, then, is the law of England and Wales concerning the potential liability of an expert witness, appointed by a court or tribunal, to a party who alleges that he has been wronged by the expert's incompetence, or worse?

---

14    Here, Scoma did not submit expert testimony with regard to what he contended the foreign law to be; and, as we just explained, Mireskandari did not properly present what he contended the foreign law to be. Had the parties presented admissible *but conflicting* expert evidence of the foreign law, the court would have had to determine the foreign law as "a question of law" pursuant to rules and procedures associated with requests for judicial notice at Evidence Code section 450 et seq. (Evid. Code, § 310, subd. (b).)

19

"31. *There is, so far as I am aware, no case law dealing expressly with this question.* That is not very surprising . . . . The question therefore needs to be addressed as one of principle." (Italics added.)

Very simply, despite its 14 pages and 50 numbered paragraphs, the Roe report presents *no law*, one way or the other, on the question presented.[15] Instead, in the five numbered paragraphs that follow the above-quoted paragraphs 30 and 31, the Roe report proffers "good reasons to believe" how an English court would rule "in a case such as the present one" *if in fact an English court were presented with the issue.* Thus, Mireskandari has not provided British law on the issue to be determined in these proceedings, only speculation as to what the British law might be in the future. For this reason, even if the Roe report were properly before us, Mireskandari would not have met his burden of establishing the first step under the governmental interest analysis.

Mireskandari suggests that the ruling in an earlier appeal in this case, *Mireskandari v. Gallagher* (Sept. 14, 2018, D071385) [nonpub. opn.] (*Gallagher*), "dictates" that the British law regarding the litigation privilege, not California's, applies. (Capitalization and underscoring omitted.) We disagree. In *Gallagher*, Mireskandari appealed from an order of the trial court striking the operative complaint pursuant to California's anti-SLAPP statute, Code of Civil Procedure section 425.16. (*Gallagher*, *supra*, D071385.) The issue on appeal was whether Mireskandari's claims were based on Scoma's protected petitioning activity (*ibid.*), because section 425.16,

---

[15]    Indeed, the trial court so found ("no party has identified authority directly on point in the U[nited ]K[ingdom"), before erroneously concluding that, "considering the parallels between the two jurisdictions, it is unlikely there would be a split on this issue."

20

subdivision (b)(1) precludes claims against a defendant like Scoma that arise from anything the defendant did "in furtherance of [his] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." We reversed the trial court, holding that "Scoma's acts—even though they took place in California—were not in furtherance of Scoma's constitutional right to petition and, thus, were not subject to California's anti-SLAPP statute." (*Gallagher*, *supra*, D071385; see *ibid.* ["for purposes of applying the anti-SLAPP statute, the protected activity is the right to petition, not the right to provide an expert opinion"].) In reaching this conclusion, we emphasized the difference "between the location of the petitioning activity [England] and the location of the defendant's acts [California]" and applied established California authority that " 'petitioning activity undertaken in a foreign country is not protected by the anti-SLAPP statute.' " (*Ibid.*, quoting *Guessous v. Chrome Hearts, LLC* (2009) 179 Cal.App.4th 1177, 1186.)

Mireskandari argues that, based on *Gallagher*, *supra*, D071385, since California's anti-SLAPP statute does not apply to strike the causes of action against Scoma, California's litigation privilege should not apply as a defense to the causes of action against Scoma. We reject this argument because *Gallagher* did not involve a choice of law or conflict of law issue. (*Ibid.*) Instead, the only issue in *Gallagher* was whether California's anti-SLAPP statute applied, and the sole focus was whether Scoma's acts were in furtherance of his United States or California constitutional right to petition. (*Ibid.*) There was no mention—or even the possibility—of the application of British law. Stated differently, because there was no choice of law or conflict of law to consider in *Gallagher*, there was no application of the governmental

21

interest analysis or the need to understand British law to determine whether it was the same as, or different from, California law in *Gallagher*.[16]

For the foregoing reasons, California law applies to Scoma's defense that the litigation privilege bars each of Mireskandari's causes of action, and Mireskandari did not meet his burden of establishing that the trial court erred in so ruling. (See *Jameson, supra,* 5 Cal.5th at p. 609 [appellant has the burden of establishing reversible error]; *Rappleyea, supra,* 8 Cal.4th at pp. 980-981 [the appellate court reviews the trial court's ruling, not the reasons stated for the ruling].)

2. *The Trial Court Did Not Err in Ruling that California's Litigation Privilege Bars Each Cause of Action in the Complaint*

Mireskandari contends that, even if the California law on litigation privilege applies to this litigation, the protections of Civil Code section 47(b) are not available to Scoma under the facts of this case. We are not convinced.

a. *Law*

The litigation privilege provides that any "publication" or "broadcast" made in any "judicial proceeding" or "other official proceeding authorized by law" is "privileged." (Civ. Code, § 47(b).) " 'The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.' " (*Jacob B. v. County of Shasta* (2007) 40

---

16    In any event, we cannot blindly rely on a prior opinion in which anti-SLAPP law, not the law associated with the litigation privilege, was at issue. That is because, as we mentioned *ante*, "a separate conflict of laws inquiry must be made with respect to each issue in the case." (*Washington Mutual, supra,* 24 Cal.4th at p. 920.)

Cal.4th 948, 955 (*Jacob B.*), quoting *Silberg v. Anderson* (1990) 50 Cal.3d 205, 212 (*Silberg*).)

The privilege is a matter of substantive law (Wegner et al., Cal. Practice Guide:  Civil Trials & Evidence (The Rutter Group 2019) ¶ 8:1852.6, p. 8E-3) and, when applicable, is "absolute," because it applies regardless of the communicator's "motives, morals, ethics or intent" (*Silberg, supra*, 50 Cal.3d at p. 220; accord, *Jacob B., supra*, 40 Cal.4th at p. 955).[17]  The underlying purposes of applying the litigation privilege include:  (1) affording litigants and witnesses the "utmost freedom of access" to courts without fear of "being harassed subsequently by derivative . . . actions"; (2) promoting the effectiveness of judicial proceedings by encouraging "open channels of communication and the presentation of evidence"; (3) encouraging attorneys to "zealously protect" their clients' interests; and (4) enhancing the finality of judgments and avoiding "an unending roundelay of litigation." (*Silberg, supra*, 50 Cal.3d at pp. 213-214.)  " 'Any doubt about whether the privilege applies is resolved in favor of applying it.' " (*Wang v. Heck* (2012) 203 Cal.App.4th 677, 686.)  "Although 'the litigation privilege has its costs, " '[i]t is desirable to create an absolute privilege . . . not because we desire to protect the shady practitioner, but because we do not want the honest one to

---

[17]  That said, the litigation privilege is subject to specified statutory exceptions, but none potentially applies here.  (See Civ. Code, § 47(b)(1) [in papers filed in an action for marital dissolution or legal separation], (b)(2) [in communications made in furtherance of an act of intentional destruction or alteration of physical evidence], (b)(3) [in communications knowingly concealing the existence of an insurance policy in a judicial proceeding], & (b)(4) [in recording a lis pendens unrelated to specified proceedings].)

23

have to be concerned with [subsequent derivative] actions.' " ' " (*Id.* at pp. 686-687, quoting in part *Silberg, supra*, 50 Cal.3d at p. 214.)

The California law on the relevant issue is clear and has been for at least 30 years: In California, the litigation privilege found at Civil Code section 47(b) bars claims by a party against a neutral expert who was retained to provide information for use in court in a pending case. (*Ramalingam v. Thompson* (2007) 151 Cal.App.4th 491, 494 (*Ramalingam*) [litigation privilege barred the claim by one party who sued the jointly retained "neutral accountant" whose expert opinions had been provided for use in pending litigation]; *Gootee v. Lightner* (1990) 224 Cal.App.3d 587, 591-596 (*Gootee*) [litigation privilege barred the claim by one party to the litigation who sued a psychology expert retained by stipulation of the parties; under the predecessor to Civ. Code, § 47(b)]; *Howard v. Drapkin* (1990) 222 Cal.App.3d 843, 848, 864 (*Howard*) [the parties stipulated to retain, and the court ordered the retention of, a specified "independent psychologist" as "a neutral third person . . . to effect a resolution of a family law dispute"; after he testified and one of the parties sued him, the litigation privilege barred the party's claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and fraud; under the predecessor to Civ. Code, § 47(b)].)

Established California case law also holds that "[Civil Code ]section 47 privileges may properly shield conduct in [a foreign country]." (*Beroiz v. Wahl* (2000) 84 Cal.App.4th 485, 494.) In *Beroiz*, the plaintiffs sued the defendants in California for alleged defamation based on the following *communications made in Mexico*: "defamatory criminal accusations against [the plaintiffs]" and "defamatory letters" the defendants published to members of an association. (*Id.* at pp. 488-489.) The appellate court affirmed

24

the trial court's grant of summary judgment to the defendants, rejecting the plaintiffs' argument "that the pertinent privileges under Civil Code section 47 do not shield conduct in [a foreign country]." (*Beroiz*, at p. 490.)

The litigation privilege has been applied as a defense to claims in cases involving each of the specific causes of action Mireskandari asserts in his complaint against Scoma: breach of contract (*McNair v. City and County of San Francisco* (2016) 5 Cal.App.5th 1154, 1169-1171 [collecting cases]); breach of fiduciary duty and fraud and deceit (*Jacob B.*, *supra*, 40 Cal.4th at p. 960 ["the litigation privilege bars all tort causes of action except malicious prosecution"]); and CMIA violations (*McNair*, at pp. 1163-1164 [collecting CMIA cases], 1168 [affirmance of application of litigation privilege to CMIA claim].)

        b.    *Analysis*

As we explain, under our Supreme Court's " 'usual formulation' " for determining whether the litigation privilege applies (quoted at pt. III.C.2.a., *ante*), here the privilege applies as a bar to each of Mireskandari's four causes of action against Scoma. (See *Jacob B.*, *supra*, 40 Cal.4th at p. 955, quoting *Silberg*, *supra*, 50 Cal.3d at p. 212.)

First, " 'the privilege applies to any communication (1) made in . . . quasi-judicial proceedings.' " (*Jacob B.*, *supra*, 40 Cal.4th at p. 955, quoting *Silberg*, *supra*, 50 Cal.3d at p. 212.) Here, Mireskandari acknowledges that the SDT proceedings were "quasi-judicial."

Second, " 'the privilege applies to any communication . . . (2) by litigants or other participants authorized by law.' " (*Jacob B.*, *supra*, 40 Cal.4th at p. 955, quoting *Silberg*, *supra*, 50 Cal.3d at p. 212.) Here, Mireskandari acknowledges that Scoma provided written communications pursuant to the SDT's instructions and "appointment . . . as an independent

25

expert," both ordered "pursuant to the law" in the SDT quasi-judicial proceedings.

Third, " 'the privilege applies to any communication . . . (3) to achieve the objects of the litigation.' " (*Jacob B.*, *supra*, 40 Cal.4th at p. 955, quoting *Silberg*, *supra*, 50 Cal.3d at p. 212.)  Here, Mireskandari acknowledges that Scoma provided a number of written communications as part of the SDT proceedings pursuant to the SDT's "order[] . . . appoint[ing] . . . Dr. Scoma as an independent expert."

Finally, " 'the privilege applies to any communication . . . (4) that ha[s] some connection or logical relation to the action.' " (*Jacob B.*, *supra,* 40 Cal.4th at p. 955, quoting *Silberg*, *supra,* 50 Cal.3d at p. 212.)  Here, Mireskandari acknowledges that *all* of Scoma's communications had a relation to the SDT proceedings, since, according to Mireskandari, the SDT recommenced the proceedings in Mireskandari's absence based on Scoma's communications.

Mireskandari's arguments do not convince us that California's litigation privilege does not apply as a bar to the causes of action in the complaint.

Most tellingly, in his appellate briefing, Mireskandari does not mention, let alone attempt to distinguish, the three California cases cited above in which the courts ruled that the litigation privilege found at Civil Code section 47(b) barred claims by a party against a neutral expert who was retained to provide information for use in pending litigation.  (*Ramalingam*, *supra*, 151 Cal.App.4th 491; *Gootee*, *supra*, 224 Cal.App.3d 587; and *Howard*, *supra*, 222 Cal.App.3d 843.)  This is despite the facts that:  (1) Scoma cited all three cases in support of his demurrer; (2) the court cited and relied on two of them in its order sustaining the demurrer; (3) Scoma cited two of the cases in

26

his appellate brief; and, significantly, (4) even Mireskandari cited one, *Gootee*, in his opposition to Scoma's demurrer in the trial court.

Mireskandari first emphasizes that, because the litigation privilege applies only to communications, the "threshold issue" is whether the defendant's conduct was communicative or noncommunicative. (*Kimmel v. Goland* (1990) 51 Cal.3d 202, 211 (*Kimmel*); *Mancini & Associates v. Schwetz* (2019) 39 Cal.App.5th 656, 661.) More specifically, Mireskandari contends that the litigation privilege does not apply to noncommunicative acts, and the fraud and deceit cause of action is based on the following noncommunicative acts: (1) Scoma's conduct "in refusing to conduct a physical examination of Mr. Mireskandari and *fraudulently concealing the reasons* for that refusal"; and (2) Scoma's conduct "in obtaining Mr. Mireskandari's private medical records *under the false pretense of 'independence,'* only to forward them to an unauthorized third party." (Italics added.) However, Mireskandari fails to discuss, let alone present an argument pursuant to, the proper standard for determining whether the litigation privilege bars a potentially noncommunicative act. Upon applying the appropriate standard, we reject Mireskandari's argument.

" 'The distinction between communicative and noncommunicative conduct hinges on the *gravamen of the action*. . . . [T]he key in determining whether the privilege applies is whether the injury allegedly resulted from an *act that was communicative in its essential nature*.' " (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1248, quoting *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1058.) Notably, " 'if the gravamen of the action is communicative, the litigation privilege extends to noncommunicative acts that are necessarily related to the communicative conduct[.]' " (*Jacob B.*, *supra*, 40 Cal.4th at p. 957, quoting *Rusheen*, at

27

p. 1065.) To show that the litigation privilege does not apply, the burden is on the plaintiff to demonstrate that " 'an independent, noncommunicative, wrongful act was the gravamen of the action[.]' " (*Ibid*.) Contrary to this established standard, Mireskandari focuses only on the acts he contends are noncommunicative, *not* on the gravamen of his claim.

The gravamen of Mireskandari's cause of action for fraud and deceit (fraudulent concealment or omission) is that he was damaged by the SDT's "reli[ance] on Dr. Scoma's reports which ultimately led to the SDT proceeding against [Mireskandari] in his absentia [*sic*]." Stated differently, had Scoma not *communicated the* reports that concealed material facts, which then resulted in the continuation of the SDT proceedings without Mireskandari, Mireskandari would have suffered no damages and, therefore, had no claim for fraud or deceit. Mireskandari's claim is not that he was damaged either by Scoma "fraudulently concealing" the reasons he did not want to conduct a physical examination of Mireskandari or by Scoma obtaining Mireskandari's medical records "under false pretenses." Rather, in his appellate briefing Mireskandari expressly tells us that he was damaged when Scoma "*forward*[ed] *them* to an unauthorized third party." (Italics added.) In *forwarding* Mireskandari's medical records, Scoma necessarily *communicated* them.[18]

---

[18] In contrast, for example, in *Kimmel, supra*, 51 Cal.3d 202, in order to obtain evidence to use in anticipated litigation, the cross-defendant recorded confidential telephone conversations in violation of California's Invasion of Privacy Act (Pen. Code, § 630 et seq.). (*Kimmel*, at pp. 206-207.) Emphasizing that the cross-complainant's claim for statutory violations was based on cross-defendant's "*conduct* regardless of the purpose for which such conduct is undertaken," our Supreme Court held that "the illegal recording of confidential telephone conversations" were "noncommunicative acts" and, thus, not subject to the litigation privilege. (*Id*. at p. 205.) There, the gravamen of the claim was a statutory violation *because the conversations*

Further, Mireskandari makes no attempt to allege in the complaint or to explain in his appellate briefing how he might have suffered $500 million in damages as a result of the arguably noncommunicative acts of either "fraudulently concealing" the reasons he did not want to conduct a physical examination of Mireskandari or obtaining Mireskandari's medical records "under false pretenses." To the contrary, in the complaint, Mireskandari clearly sets forth that the $500 million in damages he allegedly suffered resulted from *a communication*:

> "*As a result of Dr. Scoma's . . . recommendation* to the LSE/SRA and the SDT that [Mireskandari] was fit to travel to London, the SDT proceeded with the tribunal in [Mireskandari's] absentia [*sic*], resulting in the SDT striking [Mireskandari] off the roll of solicitors, thereby preventing [Mireskandari] from continuing to practice law. . . . [T]his resulted in the permanent closing of the firm, resulting in the loss of [Mireskandari's] income generated from his law firm. . . . Further, since [Mireskandari] was no longer able to practice as a solicitor, he no longer had the income to maintain various properties he owned in the United Kingdom, which were . . . worth millions of dollars. As a result of Dr. Scoma's conduct [*communicating* that Mireskandari was fit to travel to London], [Mireskandari] estimates that he has lost $500 million in income and real property." (Italics added.)

Thus, according to the complaint, a principal *cause* of Mireskandari's $500 million in damages—i.e., the gravamen of the claim—was Scoma's "recommendation to the LSE/SRA and the SDT that [Mireskandari] was fit to travel to London"; and, Scoma effected this and related recommendations by way of email *communications*. Indeed, in the complaint, Mireskandari even quotes from Scoma's emails, frequently characterizing them as "improper

_____

*were recorded illegally*, not injuries or damages that the cross-complainant suffered as a result of *communicating* the illegally recorded conversations.

29

*communications*," and criticizes Scoma for "improperly *communicat*[*ing*]" or "secretly *communicat*[*ing*]" with the LSE/SRA. (Italics added.)

As a final argument, Mireskandari suggests that Scoma's conduct was not privileged, "because no 'judicial proceedings' within the meaning of [Civil Code section ]47(b) existed or were seriously contemplated when it occurred." (Initial capitalization and underscoring omitted.) According to Mireskandari, "[a] foreign administrative tribunal regulating foreign solicitors is not a judicial proceeding as that term is contemplated by [Civil Code] section 47(b)." However, Mireskandari has forfeited appellate court consideration of this argument on at least two independent bases: (1) he did not raise this legal argument in the trial court (*Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1350, fn. 12 [" 'A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant.' "]); and (2) he did not provide any legal argument or citation to authority for the statement quoted above (*Cahill v. San Diego Gas & Elec. Co.* (2011) 194 Cal.App.4th 939, 956 ["The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived"]; see Cal. Rules of Court, rule 8.204(a)(1)(B) [each point must be supported "by argument and, if possible, by citation of authority"]). In any event, Mireskandari cannot establish the premise of his argument that "no 'judicial proceedings' " were pending at the time of Scoma's communications. That is because, elsewhere in his appellate briefing, Mireskandari twice describes the SDT proceedings as "a quasi-legal proceeding" already underway at the time of Scoma's communications and correctly recites California law by telling us that "[t]he litigation privilege applies to communications that are . . . made in . . . quasi-judicial

30

proceedings . . . ," citing *Silberg, supra,* 50 Cal.3d at page 212. (See also *Jacob B., supra,* 40 Cal.4th at p. 955.)

For the foregoing reasons, Mireskandari did not meet his burden of establishing trial court error in ruling that California's litigation privilege (Civ. Code, § 47(b)) bars each of the causes of action in the complaint.

## IV. DISPOSITION

The judgment is affirmed. Scoma is entitled to his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)


IRION, J.

WE CONCUR:


McCONNELL, P. J.


HALLER, J.